UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:26-CR-3-KAC-DCP |
| | ) | |
| SEAN EVANS, JR., | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

This case is before the Court on the United States's Emergency Motion Under 18 U.S.C § 3145 for Revocation of Magistrate Judge's Release Order [Doc. 47]. United States District Judge Katherine A. Crytzer referred this motion to the undersigned for report and recommendation [Doc. 50]. *See* 28 U.S.C. § 636(b). The Government asks the Court to revoke Defendant Sean Evan Jr.'s conditions of release imposed following his arrest and a detention hearing in the Eastern District of Michigan. After a de novo review, and assuming Defendant has rebutted the presumption, the undersigned finds that Defendant poses a danger to others and that there is no condition or combination of conditions that will reasonably assure the Court of the safety of the community and the Defendant's appearance as required. Accordingly, the undersigned recommends that the District Judge grant the Government's motion [Doc. 47].

**I. PROCEDURAL BACKGROUND**

On January 7, 2026, the Grand Jury returned an Indictment charging Defendant and sixteen named coconspirators with conspiring to distribute and possess with intent to distribute fifty grams or more of actual methamphetamine and 400 grams or more of a mixture or substance containing fentanyl, Schedule II controlled substances, from January 2024 through January 7, 2026, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A) [Doc. 7 p. 1 (Redacted Indictment);

*see* Doc. 4, SEALED]. Defendant is also charged with knowingly distributing fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), and 18 U.S.C. § 2 and distribution of five grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B), and 18 U.S.C. § 2, both allegedly occurring on July 30, 2025 [Doc. 7 p. 10]. Finally, Defendant is charged with possession of 40 grams or more of fentanyl with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B) and possession of heroin with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), both allegedly occurring on November 22, 2025 [*Id.* at 19–20].

Defendant was arrested in Detroit, Michigan, and had his initial appearance in the Eastern District of Michigan on January 14, 2026 [Doc. 74]. Defendant requested a detention hearing in that district, which was held before Magistrate Judge Elizabeth Stafford ("Judge Stafford") on January 16, 2026 [*Id.* at 7]. Following the hearing, Judge Stafford entered an Order Setting Conditions of Release ("Release Order"), which provided for Defendant's release subject to the following conditions: that he report as directed to pretrial services; restrict travel to the Eastern District of Michigan, with travel only to the Eastern District of Tennessee for the purposes of court; avoid contact with codefendants; obtain employment; not use any narcotic drugs or other controlled substance; refrain from marijuana use; have no firearms at the residence; resolve all warrants as directed by pretrial services; report to the Eastern District of Tennessee as directed by pretrial services; that he be subject to curfew as directed by pretrial services; and that he submit to location monitoring with a GPS tether [*Id.* at 8–13].[1]

At the close of the hearing, the Government requested a stay to appeal the Release Order for a twenty-four hour period. Judge Stafford denied the request, finding only minimal prejudice

---

[1] Defendant also posted an unsecured appearance bond [Doc. 74 pp. 14–15].

to the Government if Defendant were released, because there would be no difficulty in finding him, using court-ordered location monitoring. On January 16, 2026, the Government filed the Emergency Motion to Stay Release Order [Doc. 46], pending a hearing on the Government's Emergency Motion Under 18 U.S.C. § 3154(a) for Revocation of Magistrate Judge's Release Order ("Emergency Motion") [Doc. 47]. In the Emergency Motion, the Government moves to detain Defendant based on both 18 U.S.C. § 3142(f)(1)(B), as he is charged with an offense for which the maximum sentence is life imprisonment, and 18 U.S.C. § 3142(f)(1)(C), as he is charged with offenses carrying "a maximum term of imprisonment of ten years or more [as] prescribed in the Controlled Substances Act" [Doc. 47 p. 2]. The Government further asserts that "there is a serious risk that Defendant will flee" [*Id.* (quoting 18 U.S.C. § 3142(f)(2)(A)]. The Government notes that a presumption in favor of detention applies to Defendant for each of the five charged drug offenses, pursuant to 18 U.S.C. § 3142(e)(3)(A) [*Id.* at 2–3]. It contends that Defendant cannot overcome the presumption in favor of detention in this case and that he is a danger to the community as well as a flight risk [*Id.* at 12].

That same day, United States District Judge Katherine A. Crytzer ordered [Doc. 50] that the Release Order be stayed pending resolution of the Emergency Motion, that the United States Marshal Service transport Defendant to this district, that the transport be expedited, and that the remainder of the Emergency Motion be referred to the undersigned for prompt preparation of a report and recommendation [*Id.* at 2–3]. Immediately following, the Government filed an Emergency Motion for Arrest Warrant and Order Detaining Defendant, explaining that when Judge Stafford ordered Defendant's release, it had requested that the order be stayed to allow sufficient time to seek review from this Court, which Judge Stafford denied [Doc 51 p. 1], and then in the brief time that had elapsed prior to entry of this Court's Order staying the Release Order, Defendant had been released and was no longer in the custody of the United States Marshals

3

Service [*Id.* at 2]. The Government asked the Court to issue an arrest warrant and order that Defendant be detained pending further proceedings in this Court [*id.*], which District Judge Crytzer granted [Doc. 52 p. 1 (citing Doc. 50)].

Defendant arrived in this district on January 28, 2024 [Doc. 83].[2] The parties appeared for a hearing on the Government's Emergency Motion on February 4, 2026.

## II. JANUARY 16 DETENTION HEARING IN THE EASTERN DISTRICT OF MICHIGAN

Defendant appeared for a detention hearing before Judge Stafford in the Eastern District of Michigan on January 16, 2026 [Case No. 2:26-mj-30027, Doc. 6].[3] Assistant United States Attorney Ann Nee ("AUSA Nee") represented the Government. Attorney Claude M. Chapman ("Attorney Chapman") represented Defendant, who was also present.[4]

The Government presented a proffer for its argument, noting that this was a statutory presumption case and seeking detention on the basis of both danger and risk of nonappearance. The Government reviewed that Defendant has been charged by indictment out of the Eastern District of Tennessee with five counts of drug distribution, one of which is a conspiracy with intent to distribute more than 400 grams of fentanyl and more than fifty grams of methamphetamine, which is a serious charge carrying a sentence of ten years to life. The Government noted his other charges involved distributing fentanyl and heroin. According to the Government, this was a conspiracy led by Defendant where he and members of the conspiracy obtained large amounts of

---

[2] At Defendant's initial appearance and arraignment hearing in this district, the parties requested a later hearing date for Defendant's detention hearing in order to prepare for the hearing.

[3] In preparing this Report and Recommendation, the undersigned reviewed the audio recording of the detention hearing held by Judge Stafford. The summary herein is from that recording.

[4] Attorney Chapman appears to have been appointed by Judge Stafford as a Federal Community Defender [*See* Doc. 74 p. 3].

4

drugs, including fentanyl, from the Detroit area and trafficked it through a network of distributers within the Eastern District of Tennessee, including in multiple counties in and around Knoxville. Through extensive investigation with state and federal search warrants, surveillance, controlled buys, and vehicle trackers, agents developed evidence that Defendant obtained drugs outside of Tennessee and transported it to Knoxville for distribution, as a leader in that capacity. It represented that Defendant supplied others, including his codefendants, with drugs, noting at least one controlled buy where agents observed a codefendant obtain drugs from Defendant and deliver to another individual in a parking lot.

AUSA Nee stated that associated data with iCloud accounts of Defendant and others documented communications with co-conspirators consistent with distributing and selling drugs, blending drugs, and discussions of selling and buying firearms. She represented that the texts indicated that the conspiracy began at least in January 2024 and had been ongoing for the last two years.

The Government proffered that law enforcement in Tennessee had developed evidence of a network of distributors that Defendant was using in east Tennessee. By November 2025, law enforcement knew that Defendant had been making frequent trips between Detroit, Michigan, and Knoxville, Tennessee. On November 22, 2025, law enforcement conducted a stop of Defendant for speeding, during which Defendant took more than a mile to pull over and stop his vehicle. Law enforcement saw Defendant lowering and shifting in his seat and suspected that he was trying to conceal contraband or weapons in his pants. When Defendant eventually stopped, officers saw a bulge in the groin area of his pants. During the subsequent pat down, officers found a package containing 51 grams of a substance consistent with black tar heroin. As Defendant was detained and officers were trying to remove the substance, Defendant attempted to flee over the guardrail on the interstate but was pulled back by law enforcement. Defendant then tried to escape a second

5

time by running towards traffic on the interstate but was apprehended. During this time, Defendant began exhibiting medical symptoms and was taken to the hospital. A canine present at the scene alerted to a narcotics odor coming from Defendant's vehicle. A search of his car revealed in the back seat a paper bag containing 102 grams of tan powder and 33 grams of chunky material consistent with fentanyl, two cell phones, and $805 in cash.

AUSA Nee proffered that while Defendant was waiting to be discharged from the hospital, he requested to speak with agents and waived his Miranda rights. Defendant admitted that the drugs in his pants were black tar heroin, that he had paid for them, and that he was planning to deliver them to an individual in Knoxville who was then going to cut the drugs and sell them. Defendant claimed that the other substances found in the vehicle were not drugs and denied transporting drugs regularly, but he admitted to being a middleman who connected people looking for drugs to drug suppliers and discussed some of his drug connections. The Government noted, however, that agents had found communications consistent with distributing drugs and delivering them to Knoxville, indicating that he was not just a middleman. Defendant agreed to stay in Tennessee and work with law enforcement in a proactive manner on the condition that he would not be charged in connection with the traffic stop. Yet, Defendant stopped communication with law enforcement, deactivated his phone, and returned to Detroit. The Government proffered that his coconspirators also deactivated their phones, leading to the inference that they had been informed of the investigation.

The Government further proffered that Defendant told law enforcement that he was aware of an outstanding child support warrant in Detroit for which he was intentionally avoiding arrest. AUSA Nee noted that while Defendant did not have a criminal history with convictions, he was alleged to have been part of a drug conspiracy for at least two years prior to his arrest. She noted that Defendant was charged with forgery and counterfeiting in 2009 and argued that the fact that

6

he was charged with producing false evidence for insurance purposes and counterfeiting in general raises concerns with Defendant's supervision and truthfulness. AUSA Nee contended that what was more notable was the page of outstanding warrants for failure to appear from 2012 to 2023, which included the arrest warrant in this case. She noted that Defendant had a 2012 bench warrant for contempt of court; a 2013 warrant for a traffic offense; a 2015 warrant for failure to appear; a 2018 warrant for failure to appear; an August 2018 warrant for failure to appear for traffic offenses in which four different bench warrants were issued; a 2022 civil warrant for neglect of a child; a 2022 warrant for failure to appear; and two 2023 criminal bench warrants.

The Government argued that each of the 3142(g) factors weighed in favor of Detention. With regard to the nature and circumstances of the offenses, it asserted that this was a multi-year conspiracy for a large quantity of fentanyl with allegations of dealing methamphetamine. It asserted that fentanyl is extremely dangerous, that small quantities can be lethal, and that the quantities alleged to have been dealt in this case amounted to thousands of lethal doses. The Government contended that the country is suffering from a significant amount of overdoses and lethal deaths from substances with synthetic opioids primarily made of fentanyl. It cited to a report from September 2025, which found that 60% of all overdoses involved synthetic opioids with fentanyl and that 48,000 died from the overdoses. It proffered that Defendant was believed to be at the top of the conspiracy and that he was actively involved in bringing fentanyl to Knoxville to sell and to supply drug dealers in that area. When Defendant was stopped by law enforcement, he took an inordinately long time to stop his vehicle while attempting to hide evidence and also attempted to flee in a manner dangerous to both himself and law enforcement.

With regards to Defendant's ability to support himself and what that means for conditions of release, the Government highlighted that the Pretrial Services Report ("PTSR") prepared by the

United States Probation Office ("USPO")[5] reflected that Defendant has five minor children, but that he only reported work as a self-employed barber for the past few months and earned only $500 a month. It argued that his recent employment history as a whole was inconsistent with a thirty-six-year-old having actually been gainfully employed and that the likelihood he would resort to drug trafficking with these sorts of financial obligations and lack of verifiable employment is high, particularly in conjunction with his unusually large number of failure to appear warrants and his substantial number of outstanding warrants from the past thirteen years. AUSA Nee maintained that it speaks strongly to the fact that Defendant will do what he can to avoid criminal liability and that he has an established pattern of failure to appear.

Although the PTSR recommended release, the Government submitted that the proposed conditions contained in the PTSR did not address any of the issues presented at the hearing and contended that the conditions did not assure actual appearance in Tennessee. AUSA Nee argued that Defendant would be returning to the address where he lived when the alleged conduct occurred. She clarified that while the address is not alleged to be a "drug house," he would still be returning to the same location from which he would travel to Knoxville, and that he could readily go back and resume his earlier drug trafficking activities. She further highlighted the heightened risk associated with the fact that he would be prosecuted in Tennessee while living in Michigan and would be required to do a substantial amount of travel across multiple states, which was particularly concerning as this was his previous drug courier route.

---

[5]     The January 15, 2026 PTSR was prepared by the Eastern District of Michigan USPO, and the supplemental Memorandum ("Memorandum"), dated January 28, 2026, was prepared by the Eastern District of Tennessee USPO.  Both have been considered by the undersigned in preparing this report and recommendation.

The Government noted that Defendant was also less than candid, or at least inconsistent, in his pretrial services interview concerning his drug and alcohol use. It submitted that drug and alcohol use is an important factor in the ability to consistently appear before a court. While Defendant admitted to daily marijuana use and mentioned a history of taking pills, Defendant then reversed course on any pill-related substance abuse and denied any use. Defendant denied the use of alcohol, but his girlfriend had told pretrial services that he did drink alcohol. Defendant tested presumptively positive for alcohol and positive for marijuana. Overall, the Government argued that Defendant's lack of candor, his numerous bench warrants, and the seriousness of his case weighed in favor of detention.

In response, Attorney Chapman acknowledged that the charges and indictment were very serious but asked the court to remain mindful that they were mere allegations. He contended that there were a set of release conditions that would ensure both the appearance of Defendant as required and that he would not be a threat to the community. Attorney Chapman stated that Defendant was a life-long resident of Detroit, Michigan, and noted that his parents were present in the courtroom. He proffered that if Defendant were released, he could reside with them. He maintained that a location device as well as house arrest would be enough to ensure Defendant's appearance and that he would not be a threat to the community.

The Government replied and argued that these additional conditions would not resolve any issues, especially for an individual like Defendant with an established history of failure to appear.

Based upon this evidence and argument, Judge Stafford determined that Defendant had rebutted the presumption of detention and could be released on conditions. She noted that the burden on Defendant to rebut the presumption was not heavy and that he did not have to present substantial evidence. Judge Stafford found that there were conditions that would reasonably ensure the safety of the community and Defendant's appearance in court. She remarked that the rebuttable

9

presumption does not mean that certain factors inevitably lead to detention. She added that some of the Government's arguments would apply to so many defendants that it would no longer be a rebuttable presumption, but rather almost a guarantee that anyone charged with a certain type of crime would be detained, which would contravene the intent of the statute and the interpretation of the courts.

Beginning with the Government's arguments that Defendant was charged with dealing in large quantities of illegal substances, Judge Stafford noted that she had seen "kilos of drugs being transported across country boundaries," and that the quantities in this matter were relatively small compared to the conspiracies she had seen in the past. Further, while the Government had highlighted a report that found that the majority of drug overdoses involved fentanyl, Judge Stafford commented that "fentanyl is unfortunately a very popular drug" and that it did not surprise her that the majority of drug overdoses related to fentanyl. She found that accepting the Government's argument meant that anyone charged with fentanyl should be detained regardless of the quantity and that was not the approach intended by Congress.

Next addressing the Government's argument regarding Defendant's thirteen arrest warrants, Judge Stafford stated that she did not think that was a large number of traffic warrants and noted that "a lot of residents have a large list of traffic warrants they fail to address." She commented that there was no correlation between failure to appear for traffic warrants and felony charges, and stated that as a matter of practice, magistrate judges have not detained people on the basis of having a lot of traffic warrants.

As for the fact that Defendant would be living in the same house where he was residing at the time of his alleged drug trafficking activity,[6] Judge Stafford stated this was not unusual and

---

[6]     The PTSR noted that Defendant currently lived with his girlfriend, Lauriyale George, at a rented residence in Dearborn Heights, Michigan.

noted that it would be different if the residence was the location of the criminal activity. She observed that in this case, it was alleged that Defendant was driving to Tennessee to engage in criminal activity. Further, while the Government pointed to the fact that Defendant did not live in the charging district, Judge Stafford remarked this was true in most removal cases and that she was not going to detain someone simply because they were charged in a district other than where they reside.

Judge Stafford acknowledged that Defendant was not candid about his drug and alcohol use but noted that he had admitted to at least some drug use. She further noted that while marijuana was illegal under federal law, she was not going to detain everyone who was not completely forthright about their drug use, particularly when they test positive for marijuana.

Addressing the Government's argument regarding Defendant's lack of employment, Judge Stafford acknowledged that he does not have a significant employment history and "does not appear to be doing a good job" in financially caring for his children, but ultimately concluded this was not a reason for detainment.

Judge Stafford observed that Defendant had little criminal history and no convictions. She maintained that arrests, which do not result in a conviction, are not as relevant as actual convictions, and she gave his prior charge for forgery and counterfeiting little weight. Judge Stafford commented that if he were to be detained based on this criminal history, it would be a presumption that anyone charged with a drug trafficking offense should be detained. Again, she found this result would be contrary to the wording of the statute, the intent of Congress, and the interpretation of the courts.

In releasing Defendant on conditions, Judge Stafford required that he have location monitoring and a curfew because the alleged crime involved traveling out of state to engage in drug trafficking operations. She submitted that she would not presume that Defendant would

11

continue to engage in drug trafficking if released to reside at his parents' home in Detroit with location monitoring, because that would require Defendant to move his drug operations potentially onto "someone else's turf," which could be dangerous. Judge Stafford then asked the probation officer, who was present at the hearing, whether location monitoring with curfew would minimize the concerns raised by the Government. The probation officer deferred to the judgment of the Court but asked that Defendant pay the cost of the location monitoring and be required to resolve his outstanding warrants.

At that point, the Government requested a stay to appeal the Release Order, which Judge Stafford denied. She stated that that there was no basis for having Defendant detained over a three-day weekend, as she did not find this was a close case for detention, given that the quantities of drugs involved were not large compared to other conspiracies she had seen previously, the fact that he had strong ties through his family in the Detroit area, and that he would be on location monitoring.

Judge Stafford then questioned Defendant's father, having him confirm that Defendant would be able to live with him and that there were no firearms present in the house. Judge Stafford then reviewed the release conditions with Defendant and concluded the hearing.

## III.  FEBRUARY 4 EVIDENTIARY HEARING BEFORE THE UNDERSIGNED

At the February 4, 2026 hearing on the Emergency Motion, Assistant United States Attorney Michael Gilmore ("AUSA Gilmore") represented the Government, and Attorney Mary Newton ("Attorney Newton") represented Defendant, who was also present.

The Government presented five exhibits: (1) an application, and affidavit for a search warrant of the location data for a Verizon Wireless cellphone alleged to be Defendant's; (2) the Knox County Sheriff's Office ("KSCO") Narrative for Defendant's arrest pursuant to a traffic stop; (3) a photograph of a firearm recovered from a search warrant of named Codefendant

12

Desmond Jackson's iCloud account, identified in reference to a conversation between Codefendant Jackson and Defendant; (4) a photograph recovered from Defendant's iCloud account of a grey, puck-shaped substance in a bag on top of a scale, suspected to be fentanyl; and (5) a screenshot of a photograph on a cellphone, dated November 15, 2025, showing Defendant, Codefendant Jackson, and an unindicted co-conspirator,[7] at a bar or lounge in Knoxville, Tennessee.

The undersigned has reviewed the exhibits and observes that Exhibit 1 is an affidavit in support of an application for a search warrant, written by FBI agent Joshua Vittatoe ("Agent Vittatoe") [Exh. 1]. Agent Vittatoe describes the investigation of Defendant in relation to suspected drug trafficking in Michigan and Tennessee, and his use of a cellphone to facilitate his criminal activities. Agent Vittatoe submitted there was reason to believe that Defendant was in Michigan following a traffic stop that occurred in the Eastern District of Tennessee on November 22, 2025. Agent Vittatoe noted that once Defendant was aware that the KSCO would be placing warrants for his arrest stemming from the traffic stop, the geolocation data for Defendant's phone showed that he had returned to the Eastern District of Michigan. The affidavit details that on September 24, 2025, a search warrant was issued for the iCloud account associated with Defendant's telephone, which revealed what agents described as communications consistent with drug sales. Agents also received multiple search warrants for iCloud accounts belonging to Codefendant Jackson, which revealed multiple text threads between Codefendant Jackson and telephone numbers saved as "Shig," "Shig2", and "Shig3." The affidavit asserts that "Shig" is the nickname utilized by Defendant, as identified via the search warrant for Defendant's iCloud.

According to the affidavit, the search warrants for Codefendant Jackson's iCloud accounts revealed a photograph of an AR style rifle with an extended magazine, sent by Codefendant

---

[7] The Government stated that the unindicted co-conspirator is facing controlled substance and firearm charges in Knox County, Tennessee.

Jackson to Defendant and an accompanying discussion about the potential sale of the firearm. Agents also observed a text from Codefendant Jackson to "Shig2," in which Codefendant Jackson asked Defendant to find and purchase illegal drugs for him. Agents further identified texts between Codefendant Jackson and Defendant on August 25, 2024, which Agent Vittatoe represents pertains to Codefendant Jackson attempting to meet with Defendant to obtain illegal narcotics. On November 10 and November 16, 2024, Codefendant Jackson and a cellphone number saved as "Shig3" discussed the transfer of money, as well as "Kellz," which the agents note is in reference to named Codefendant Kelly Hamic.

On July 21, 2025, agents conducted a controlled drug purchase from Codefendant Jackson utilizing a confidential human source ("CHS"). The CHS arranged the drug deal through a series of recorded telephone calls and Signal messages to Codefendant Jackson. Codefendant Jackson informed the CHS that he would be going to the south side of Knoxville to pick up the drugs. Agents then drove to an apartment frequently used by Codefendant Jackson and his coconspirators as a trap location for the purpose of illegally distributing narcotics. There, the agents observed a black Chrysler Pacifica parked near the apartment and surveilled it as it departed and travelled onto Western Avenue. Codefendant Jackson instructed the CHS to drive towards Western Avenue and provided the address of 2415 Truman Avenue, Knoxville, Tennessee for the location of the drug deal. When the CHS arrived at the address, he informed Codefendant Jackson, who arrived shortly thereafter in the Chrysler Pacifica. Codefendant Jackson exited the vehicle and provided the CHS with suspected fentanyl in exchange for $2,400 of FBI recorded drug funds. The CHS advised there were two other black males in the Chrysler Pacifica at the time of the drug purchase. Agents had also observed multiple occupants inside the vehicle as it traveled to the deal location. A records check revealed that the black Chrysler Pacifica was rented by Defendant.

14

On July 30, 2025, the FBI conducted a second controlled drug purchase for two ounces of methamphetamine from Codefendant Jackson using the CHS. Codefendant Jackson informed the CHS that he had methamphetamine that he could sell to the CHS that belonged to his "cousin." Codefendant Jackson instructed the CHS to come to 1229 Austin Homes Boulevard, which has been identified as a former residence for Codefendant Jackson and his girlfriend. When the CHS informed Codefendant Jackson of his arrival, Codefendant Jackson told him he would be back in eight minutes. Codefendant Jackson was seen by agents arriving in the parking lot of 1229 Austin Homes Boulevard in a green Ford SUV. The black Chrysler Pacifica then arrived in the same parking lot. The agents observed Codefendant Jackson walk to the black Chrysler Pacifica and briefly interact with Defendant. Codefendant Jackson then called the CHS and asked for his location in the parking lot. Codefendant Jackson entered the CHS's vehicle and provided approximately two ounces of methamphetamine and a "sample" of fentanyl in exchange for the recorded FBI funds. Agent Vittatoe represents that he believed that when Codefendant Jackson referred to the methamphetamine belonging to his "cousin," he was referring to Defendant and that Codefendant Jackson had received the illegal narcotics sold to the CHS from Defendant in the parking lot of 1229 Austin Homes Boulevard.

On August 25, 2025, agents observed a new rental vehicle, a black Chevrolet Tahoe, parked near Defendant's then-residence in Oak Ridge, Tennessee. A records check confirmed that Defendant was the current renter of the vehicle. During this investigation, Detroit, Michigan was identified as a geographical location where Codefendant Jackson, Defendant, and others obtained narcotics and transported them to Knoxville, Tennessee for redistribution. Agents utilized a license plate reader for the tag associated with Defendant's rental vehicle and identified two separate, recent short-term trips to Detroit, Michigan, on September 8 and September 16, 2025. Agent

Vittatoe believes that Defendant has conducted multiple short-term trips to Detroit, Michigan for the purpose of transporting illegal narcotics.

A review of Defendant's iCloud account revealed texts between Defendant and a telephone number saved as "Maine Cuz" discussing the sale of marijuana from Defendant to Maine Cuz. Further texts on May 6 through May 9, 2025, between Defendant and Maine Cuz discussed how something "still ain't came." The text messages ceased until June 9, 2025, when Maine Cuz sent an address. Upon reviewing the images in Defendant's iCloud, agents observed an image of a FedEx shipping label, with the address sent by Maine Cruz, for a seventy-two-pound package addressed to "Sara Wilson" from an address in Long, Beach California, shipped on May 5, 2025. Agent Vittatoe represents that it is common for drug traffickers to ship large quantities of illegal drugs through the mail using fictitious names and addresses, and that he believes Defendant was utilizing "Maine Cuz" and that address for the purpose of shipping illegal drugs, specifically marijuana.

Additionally, agents observed another conversation between Defendant and a telephone number saved as "JayO" discussing the sale of marijuana for $5,500.

The affidavit further details the traffic stop conducted on November 22, 2025, pursuant to the agents learning that Defendant was traveling towards Knoxville from another short-term trip to Detroit. During the traffic stop, agents located approximately 51.3 grams of a soft, black, doughy substance consistent with black tar heroin on Defendant's person, along with other drug related evidence in the vehicle. Defendant waived his Miranda rights and agreed to speak with agents and admitted that the substance was in fact black tar heroin that he had purchased in Detroit and transported to Knoxville where he intended to cut and resell the drugs. Defendant provided multiple other statements and advised that he would like to cooperate with law enforcement. He was told that if he did not follow through with his agreement to cooperate, warrants would be

16

placed on file for his arrest in the State of Tennessee for the charges stemming from the traffic stop. Agents made multiple attempts to meet with Defendant without success. Shortly thereafter, Defendant's primary telephone, which agents had a court authorized geolocation search warrant on, began pinging in Detroit, indicating that it was located there. Following that, it appeared Defendant "dropped" this device.

Exhibit 2, the Incident Report Narrative from Defendant's traffic stop on November 22, 2025, provided additional context. The narrative states that when the officer conducting the stop activated his emergency lights and siren, Defendant initially activated his right turn signal as though he intended to pull over to the shoulder but canceled the signal and continued traveling south. A short time later, he reactivated his right turn signal and began to straddle the fog line, driving partially on the shoulder, for approximately one mile before coming to a slow-roll stop. Defendant was observed making suspicious movements in his seat, which appeared awkward and deliberate, including raising himself up toward the middle of the vehicle before lowering himself back down. The officer represented that these movements were consistent with a driver attempting to conceal contraband, such as a weapon or package in the front of their pants, near the groin area, in an effort to hide it from law enforcement.

During the subsequent pat-down of Defendant, a detective reported feeling what he immediately recognized as a drug package near Defendant's left hip/groin area. Defendant acknowledged the discovery and agreed to remove the item from his underwear but made excuses and feigned difficulty in retrieving it. The contraband was eventually removed by an officer and was revealed to be the aforementioned 51.3 grams of black tar heroin. As officers were trying to remove the drug package, Defendant attempted to flee over a guardrail but was unsuccessful. He then tried to run toward interstate traffic but was apprehended. Shortly thereafter, he began to exhibit seizure-like symptoms and was transported to a hospital for further evaluation. A K-9 unit

17

arrived at the scene, and upon conducting a free-air sniff of the vehicle, the dog alerted to the odor of narcotics emanating from the vehicle. A probable cause search revealed approximately 102.9 grams of tan powder and 33.8 grams of tan, chunky material consistent with fentanyl, found in the back seat area inside a brown paper bag.

Defense counsel presented four PDFs containing the audio transcript from Defendant's detention hearing in Michigan and eight letters from Defendant's family and friends, written in support of his release for the Court's consideration [*See* Exhs. 6, 7].[8] These letters were from the mother of two of his children, two cousins, his fifteen-year old son, his eighteen-year old daughter, his mother, an acquaintance, and his aunt and uncle. These family members and friends attested to his good character. Defense counsel highlighted that Defendant's daughter wrote that she had just recently turned eighteen years old and that this was her first birthday without her father.

At the February 4 hearing, the Government noted that Defendant was eligible for detention, based on several sections, including 21 U.S.C. § 3142(f)(1)(B) as he is facing a maximum sentence of life, and 21 U.S.C. § 3142(f)(1)(C) as it was a controlled substance case carrying a potential sentence of ten years or more. The Government further submitted that Defendant posed a serious risk of flight under 21 U.S.C. § 3142(f)(2)(A). The Government maintained that the rebuttable presumption under 18 U.S.C. § 3142(e)(3)(A) that there is "no condition or combination of conditions [that] will reasonably assure the appearance of the person as required and the safety of the community" applies in this case and that the presumption places the burden of production with the Defendant to show probative credible evidence that he will appear before the court as required

---

[8]     The Court notes that on February 17, 2026, Defendant filed a Motion for Leave to Late-File Additional Letters of Support," asking the Court "for leave to late-file additional letters of support that were not received by counsel until after [Defendant's] hearing on February 4, 2026" [Doc. 114]. Because these letters were provided after the closing of proof at the detention hearing, the Court denied Defendant's motion [Doc. 115]. The Court notes, however, that even if the Court were to consider the three late-filed letters, it would not change the undersigned's analysis.

and will not pose a danger. Here, the Government contended that it does not believe that there are any proposed conditions that would overcome the presumption or combination of conditions to assure safety or appearance of Defendant as required.

Beginning with the nature and the circumstances of the offense, AUSA Gilmore stated that Defendant was charged with trafficking methamphetamine and fentanyl and contended that these were exceptionally dangerous offenses that posed great harm to the community. AUSA Gilmore argued that Defendant was not a run-of-the mill drug dealer but rather an active participant in the charged conspiracy. Referencing the affidavit for the search warrant [Exh. 1], AUSA Gilmore submitted that the facts show that multiple cooperators identified Defendant as a source of supply and that he was the main player in this drug conspiracy with his sixteen codefendants. AUSA Gilmore highlighted that text messages between Defendant and Codefendant Jackson included discussions regarding the availability of firearms. He acknowledged that while no firearms were recovered from Defendant in this case, he submitted that it was relevant that the conspiracy included discussions of firearms at some point.

Turning to the physical evidence in the case, AUSA Gilmore pointed to the rental of the black Chrysler Pacifica in Defendant's name, as well as the iCloud account and his physical presence throughout the case. He focused on the controlled purchase on July 21, 2025, where Codefendant Jackson was seen driving the Chrysler Pacifica. AUSA Gilmore explained that the reason Defendant was not charged for this controlled purchase was because he was not seen physically handing Codefendant Jackson the drugs; however, he noted the presence of the black Chrysler Pacifica registered in Defendant's name. AUSA Gilmore further cited the July 30, 2025 controlled drug purchase that Defendant was charged with, and the presence of the same vehicle, as well as Codefendant Jackson's statement to the confidential informant that he would be getting the drugs from his cousin, referring to Defendant.

19

AUSA Gilmore proffered that after the traffic stop on November 22, 2025, Defendant attempted to minimize his conduct and contended that he was not a major player in the conspiracy. He noted that the only reason that Defendant did not go to jail was predicated on the promise that he would cooperate with law enforcement. AUSA Gilmore highlighted that Defendant did not cooperate, and that the next time his phone pinged, he was in Detroit, Michigan, having quickly "blown off law enforcement and got out of town." AUSA Gilmore also proffered that when Defendant was speaking to law enforcement, he referenced that he knew he had an outstanding warrant for failure to pay child support and that he was actively avoiding it, and that Defendant failed to mention the other eleven active arrest warrants.

AUSA Gilmore proffered that during his conversation with law enforcement, Defendant referenced a gang in Detroit, Michigan. AUSA Gilmore represented that the gang is a very large supplier of fentanyl and the biggest supplier of fentanyl in the Knoxville area. AUSA Gilmore further proffered that Defendant had a relationship with an individual in that network who is currently under federal indictment, and that a search warrant conducted in a gang-related residence revealed that Defendant's fingerprints were found on a fentanyl press located in the residence.

Turning to the second factor, the weight of the evidence against Defendant with regards to dangerousness and risk of nonappearance, AUSA Gilmore pointed to the PTSR, which detailed a list of thirteen active arrest warrants. While one was for the case at hand, AUSA Gilmore highlighted that nine were for failure to appear, and the others were for contempt of court, failure to pay child support, and child neglect. AUSA Gilmore contended that the weight of evidence toward nonappearance was strong, based on Defendant's active arrest warrants, which indicated a failure to appear and comply with court-imposed restrictions or mandates. AUSA Gilmore argued that the fact that several were for driving on a suspended license is a crime indicative of being noncompliant. AUSA Gilmore further pointed to the November 22, 2025 arrest as evidence

20

showing a risk of flight, as Defendant tried to flee law enforcement first by attempting to go over the guardrail and then by running toward interstate traffic.

ASUA Gilmore then discussed Defendant's issues with substance abuse and noted that during his interview with the USPO, Defendant admitted to daily usage of marijuana and denied alcohol use, but then subsequently tested positive for alcohol consumption. When asked about his substance abuse, Defendant stated, "They say I have an addiction." Defendant was asked to elaborate, and reported a history of pills, but when he was asked to clarify, Defendant said, "Never mind," and then denied any history of substance abuse. Finally, AUSA Gilmore maintained that Defendant had a large incentive to flee as he was facing a minimum of ten years in prison and up to life, a significant criminal sentence.

Next, turning to the weight of danger, AUSA Gilmore emphasized that Defendant was charged with an inherently dangerous offense of drug trafficking. He submitted that the Court should consider the fact that Defendant was discussing firearms at one point with Codefendant Jackson.

Under the third factor, the history and characteristics of Defendant, AUSA Gilmore conceded that there was very little criminal history, but argued that Defendant had issues with substance abuse and was not honest with the USPO about his alcohol use, which increases the risk of flight. AUSA Gilmore maintained that Defendant had a large incentive to flee due to not only his potential sentence, but also because of his history of failing to appear and for contempt of court. AUSA Gilmore further pointed out that Defendant's employment was contradicted by his girlfriend and maintained that where employment was vague and unclear, it weighed in favor of detention.

Finally, under the fourth factor of nature and dangerousness to the community, AUSA Gilmore once again emphasized the danger that drug trafficking poses. AUSA Gilmore concluded

21

by arguing that the Court must consider the good faith of Defendant and whether he would follow any conditions set by the Court, and that this is contravened by the multiple arrest warrants dating back to 2012.

Attorney Newton began by stating that if the Court were to be operating under a de novo standard, that she would remind the Court that under the case law, the de novo review in this situation does not mean starting from scratch. She further cited to *United States v. Yamini*, 91 F. Supp. 2d 1125 (S.D. Ohio 2000),[9] for the proposition that the District Court should not defer to the magistrate judge's ultimate conclusion in pretrial release or detention determinations but asked the Court to take judicial notice of the prior detention hearing that was held in the Eastern District of Michigan. She provided the Court with four PDFs with audio-embedded attachments of the detention hearing and noted that on the date of the detention hearing, Defendant had been taken for medical care, which resulted in delay of the initial detention hearing.

Attorney Newton noted that Defendant was released on conditions of GPS monitoring and a curfew but then rearrested the next day pursuant to the warrant issued by District Judge Crytzer. She highlighted that Defendant was arrested at his father's house, the location he was supposed to be per the release conditions. Attorney Newton directed the Court to focus on the part of the previous detention hearing where Defendant's father confirmed that Defendant would be able to live with him and that he owned no firearms. She explained that his father was unable to physically attend the hearing, but he could be reached by phone, if the Court desired.

---

[9] The undersigned notes that in *Yamini,* under de novo review, the defendant was detained based on danger and flight risk. *Yamini,* 91 F. Supp. 2d at 1131. Further, specifically as to flight risk, the court noted prior failures to appear on less serious charges, tenuous ties to community of the charging district, and lack of employment. *See id.*

Attorney Newton then pointed to the eight letters of support provided for Defendant, given by an acquaintance, Lori Georgopoulous, and several members of his family, including April Harrell, the mother of his two oldest children; Gwendolyn Terrell and Nicole Williams[10] two of Defendant's cousins; Sean Evans Jr., his fifteen-year old son; Nevaeh Evans, his eighteen-year old daughter; Takisha Williams his mother; and Daran and Faye Carey, his uncle and aunt. Attorney Newton informed the Court that the mother of one of his children was present in the courtroom, and that she lives in Knoxville with the child they share. Attorney Newton also proffered that Defendant has another child, who lives in Knoxville.[11] She submitted that Defendant only needs to show some evidence of ties to the community and contended that the two children living in Knoxville, as well as the letters of support and prior support of the family in Michigan weighs against the need for detention in this matter. Attorney Newton suggested that Defendant be released on the same conditions or be released to his father as a third-party custodian. She contended that people would help him travel from Detroit to Knoxville for any court dates and that Defendant otherwise could remain on house arrest[12] or with geographic limitations subject to the Court's order.

Alternatively, Attorney Newton proffered that Defendant has an eighty-seven-year-old grandmother that he checks in on once a day and that he could live with her. When asked by the Court, Attorney Newton clarified that the grandmother's residence had not previously been vetted by USPO.

---

[10]     In her letter, Nicole Williams refers to "Shawn Williams" and not "Sean Evans" [*See* Exh. 7].

[11]     It is noted that his information is inconsistent with that in the PTSR, which indicates that Defendant has five children, with the youngest child residing in Knoxville and the others living in Detroit.

[12]     As previously reviewed, Judge Stafford placed Defendant on a curfew, not home detention.

23

Attorney Newton argued that the burden was with the Government to prove that no conditions would reasonably assure the safety of the community or appearance of Defendant. She reminded the Court that while the Court had heard about law enforcement's investigative findings leading to this case, Defendant was to be presumed innocent and that the weight to the evidence is akin to presumption of guilt. Additionally, while the Government proffered evidence regarding firearms, Attorney Newton contended it was not illegal to send pictures and discuss guns. She argued that Congress has not prohibited the charges against Defendant as charges that a person cannot be released on, and that there has to be an additional "hook" as to why Defendant poses a danger. While Attorney Newton acknowledged that there were open cases against Defendant, she pointed to the fact that he had never been convicted of a felony.

In response, the Government again highlighted that it was Defendant's burden to provide some credible evidence that he will appear when required and not pose a danger. AUSA Gilmore acknowledged that Defendant did have strong support from his family and friends but argued if that were enough to ensure Defendant's compliance, it conflicted with the fact that Defendant had twelve outstanding arrest warrants. AUSA Gilmore maintained that what Defendant offered was not enough to overcome the presumption, especially in light of the danger that fentanyl and methamphetamine trafficking poses to the community.

After the undersigned heard the parties' proffers, evidence, and arguments, the matter was taken under advisement.

## IV.    ANALYSIS

The Bail Reform Act of 1984 provides for the release of all persons accused of a federal crime, either on personal recognizance or an unsecured appearance bond, "unless the judicial officer determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community." 18 U.S.C. § 3142(b).

24

If release on personal recognizance or an unsecured appearance bond will not reasonably assure the person's appearance or the safety of the community, the judicial officer shall order that the individual be released on conditions. 18 U.S.C. § 3142(c).

Upon the government's motion, however, the judicial officer may detain a person charged with certain serious federal crimes or who poses a "serious risk" of flight, witness intimidation, or obstruction of justice, if the judge finds, after a detention hearing, "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community[.]" 18 U.S.C. § 3142(f) & -(e). The judge may not detain a defendant unless the government proves by a preponderance of the evidence that the individual is a flight risk and/or by clear and convincing evidence that the person is a danger to the community or others. *See* 18 U.S.C. § 3142(f).

"If a person is ordered released by a magistrate judge . . . , the attorney for the Government may file, with the court having original jurisdiction over the offense, a motion for revocation of the order[.]" 18 U.S.C. § 3145(a)(1). The district judge reviews the decision to release or detain the defendant de novo.[13] *Yamini*, 91 F. Supp. 2d at 1128 (holding that although the Sixth Circuit has yet to address this issue, the majority of circuits hold that de novo review is appropriate); *see also United States v. Rosello*, No. 1:21-cr-7, 2021 WL 5759142, at *1 (S.D. Ohio Dec. 4, 2021) (citing *Yamini*, 91 F. Supp. 2d at 1127–29); *United States v. Tolbert*, Nos. 3:09-CR-56 & 3:10-CR-30, 2017 WL 6003075, at *4 (E.D. Tenn. Dec. 4, 2017). "[M]eaningful *de novo* review

---

[13] Although a magistrate judge cannot review another magistrate judge's decision to release a defendant, a district judge may refer the Government's motion to revoke a release order to a magistrate judge for report and recommendation. *United States v. Shaw*, No. 5:17-CR-26, 2017 WL 5711438, at *2–3 (E.D. Ky. Nov. 17, 2017), *adopted by* No. 5:17-CR-26, 2017 WL 5710443 (E.D. Ky. Nov. 27, 2017). The district judge will ultimately conduct a de novo review of the detention issue by reviewing the report and recommendation, which considers all the evidence offered to that point. *Id.* at *3.

25

means that the district court should engage in the same analysis, with the same options, under § 3142 as the magistrate judge." *Yamini*, 91 F. Supp. 2d at 1129; *Tolbert*, 2017 WL 6003075, at *4 (observing that the district judge has discretion to consider additional evidence to that presented at the original detention hearing). A motion to revoke a release order "shall be determined promptly." 18 U.S.C. § 3145(a).

To determine de novo whether Defendant Evans should be released or detained pending trial, the undersigned must first examine whether the presumption of detention set forth in 18 U.S.C. § 3142(e)(3) applies in this case, and if so, whether Defendant rebutted the presumption. If rebutted, the undersigned must then weigh the factors set out in 18 U.S.C. § 3142(g), along with the rebutted presumption, to determine if release on conditions will reasonably assure Defendant's appearance at court proceedings and the safety of any person and the community. The Court examines whether clear and convincing evidence shows Defendant to be a danger to the community and/or whether a preponderance of the evidence shows him to be a flight risk and, if so, whether conditions can mitigate that danger or risk of nonappearance.

### A. Presumption of Detention

Before turning to the § 3142(g) factors, the undersigned finds that a presumption in favor of detention applies in this case under 18 U.S.C. §§ 3142(e)(3)(A).

Section 3142(e)(3)(A) provides that, if a defendant is charged with an offense under the Controlled Substances Act, for which a maximum term of imprisonment of ten years or more is prescribed, a rebuttable presumption that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community. Here, the presumption in favor of detention applies to Defendant for each of the five charged drug offenses, pursuant to 18 U.S.C. § 3142(e)(3)(A). The Indictment provides probable cause to believe that Defendant has committed offenses under the Controlled Substances Act for which he

26

faces a maximum sentence of ten years or more and an offense under 3142(f)(1)(B). *See United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010) ("A grand jury indictment, by itself, establishes probable cause to believe that a defendant committed the crime with which he is charged." (citing *United States v. Hazime*, 762 F.2d 34, 37 (6th Cir. 1985))). Defendant therefore qualifies for the application of the presumption. This presumption places the burden of production with Defendant, while the Government retains the burden of persuasion. *Id.* at 945.

The next question, then, is whether Defendant has rebutted the presumption of detention. Defendant's burden to rebut the presumption "is not heavy" but he must come forward with some evidence. *Stone*, 608 F.3d at 945–46. The undersigned questions whether Defendant has carried that burden in connection with the de novo proceedings related to the Emergency Motion. As in his detention hearing in Michigan, Defendant notes his lack of criminal history and he asserts that he has strong family connections in both Knoxville, Tennessee, and Detroit, Michigan. Defendant offers that he be released on the same conditions of GPS monitoring and a curfew.[14] The undersigned finds that Defendant has minimally rebutted the presumption but under the law of the Sixth Circuit, if a defendant rebuts the presumption, the Court still must consider the presumption in its determination of whether conditions exist that could assure community safety and the defendant's appearance as required. *United States v. Hinton*, 113 F. App'x 76, 78 (6th Cir. 2004) ("The presumption in favor of detention does not vanish simply because a defendant comes forward with evidence to rebut it. Were the presumption to vanish, 'courts would be giving too little deference to Congress' findings regarding this class.'" (quoting *United States v. Martir*, 782 F.2d 1141, 1144 (2d Cir. 1986))); *see also Stone*, 608 F.3d at 945 (explaining that even when a defendant meets the burden of production, the Court must continue to weigh the presumption that

---

[14]    During the hearing, Defendant also offered that he be released on new conditions of house arrest and with his father serving as third-party custodian, if the Court saw it fit.

27

detention is appropriate along with the other factors, because "the presumption reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial").

## B. Section 3142(g) Factors

Turning to the § 3142(g) factors, the undersigned first considers the nature and circumstances of the charged offenses. 18 U.S.C. § 3142(g)(1). Defendant is charged, along with sixteen coconspirators, with conspiring to distribute and possession with intent to distribute fifty grams or more of actual methamphetamine and 400 grams or more of fentanyl from January 2024 through January 7, 2026 (Count 1) [Doc. 7 p. 1]. Defendant is also charged with the distribution of five grams or more of actual methamphetamine (Count Twenty-Three) and the distribution of fentanyl (Count Twenty-Four) on or about July 30, 2025 [*Id.* at 10]. Finally, Defendant is charged with possession with intent to distribute forty grams or more of fentanyl (Count Forty-Nine) and possession with intent to distribute heroin (Count Fifty) [*Id.* at 19–20]. The Indictment charges Defendant with possessing and conspiring to distribute a large amount of fentanyl, which is a particularly dangerous controlled substance. *See United States v. Taylor*, 449 F. Supp. 3d 668, 673 (E.D. Ky. 2020) (finding fentanyl to be an "exceptionally dangerous drug" under § 3142(g)(1)); *see also United States v. McCollum*, No. 3:21-CR-35, 2021 WL 4468937, at *2 (E.D. Tenn. Sept. 29, 2021) (upholding magistrate judge's finding that fentanyl is a particularly dangerous drug under § 3142(g)(1)). The undersigned finds that the nature and circumstances of the offenses show that Defendant presents a serious danger to the community. *See* 18 U.S.C. § 3142(g)(1).

The second factor, the weight of the evidence of the Defendant's dangerousness and risk of nonappearance, also favors detention. 18 U.S.C. § 3142(g)(2). This factor "goes to the weight of the evidence of dangerousness [and risk of nonappearance], not the weight of the evidence of

28

the defendant's guilt."[15] *Stone*, 608 F.3d at 948; *see also United States v. Villegas*, No. 3:11-CR-28, 2011 WL 1135018, at *8 (E.D. Tenn. Mar. 25, 2011) ("In other words, this factor goes to how convincing the government's arguments of dangerousness and risk of flight are." (citation omitted)). Regarding Defendant's risk of nonappearance, the undersigned notes Defendant's multiple arrest warrants for failures-to-appear, his criminal bench warrant for contempt of court, and his civil warrant for neglect of a child. *See Yamini*, 91 F. Supp. 2d at 1131 (noting that "[i]t is a realistic assumption that [the defendant] may fail to appear on the present more serious charges with dire sentencing consequences, if he failed to appear on less serious charges"). In addition, the undersigned considers Defendant's conduct during the November 22, 2025 traffic stop in which he attempted to flee twice from law enforcement officials and his decision to leave Tennessee and return to Detroit despite telling agents that he would cooperate in the investigation with the understanding that arrest warrants would be issued if he failed to follow through. *See United States v. Martin*, No. 2:25-CR00053, 2025 WL 3216647, at *2 (E.D. Tenn. Nov. 18, 2025) (noting that "attempts to evade arrest . . . can bolster a finding of serious risk of flight"). Furthermore, Defendant's circumstances support that he would have a strong incentive to flee as he faces significant penalties from a minimum of ten years to life imprisonment. *See United States v. Shuklin*, No. 19-4171, 2020 WL 2992522, at *1 (6th Cir. Mar. 18, 2020) (observing that "significant penalties," such as a maximum of twenty years in prison, "provides a strong incentive to flee").

As for dangerousness, the affidavit relates and the Government proffered that Defendant was a leader of a multi-state drug trafficking operation involving large amounts of fentanyl as well

---

15     Indeed, "[n]othing in [§ 3142] shall be construed as modifying or limiting the presumption of innocence." 18 U.S.C. § 3142(j).

as methamphetamine. Defendant was connected to a controlled buy for the sale of narcotics. Further, Defendant was found with 102.9 grams of tan powder and 33.8 grams of tan, chunky material consistent with fentanyl during the referenced traffic stop and admitted to drug trafficking. Given this activity, the weight of the evidence of Defendant's dangerousness is great. Indeed, drug trafficking is inherently dangerous, *United States v. Hernandez*, No. 1:02–CR–006, 2002 WL 1377911, at *2 (E.D. Tenn. Feb. 27, 2002), and "[i]t is beyond dispute that distributing narcotics is a serious offense that poses dire health risks to the community—and the risks associated with fentanyl specifically are even greater," *Taylor*, 449 F. Supp. 3d at 673.

The third factor examines Defendant's history and characteristics. 18 U.S.C. § 3142(g)(3). The undersigned has considered, among other things, his work experience, family ties, substance abuse, and criminal history. Defendant is thirty-six years old. He graduated from high school in 2007 and attended some college. According to the PTSR, while Defendant reported self-employment as a barber, Defendant's girlfriend, Ms. George, indicated that he was unemployed and that she financially supports him. Prior to working as a barber, Defendant reported intermittent employment with his father's landscaping company and unspecified employment through a Manpower temp agency. Despite not reporting any significant means of income,[16] Defendant represented that he financially supports his children, but as proffered by the Government, he has admittedly been attempting to avoid arrest for non-payment of child support.

As to family and community ties, the undersigned credits the letters of support from Defendant's family and friends and the willingness of his parents to have him reside at their home, but these ties have not prevented his engagement in traveling to and from Detroit, allegedly trafficking highly dangerous drugs in East Tennessee. And these ties are weighed against

---

[16]    According to the PTSR, Defendant's self-employment as a barber for the past year consisted of earning $500.00 a month and working twenty hours a week.

Defendant's other ties to individuals allegedly engaged in drug trafficking, including an individual in a known fentanyl-supplying drug gang in Detroit, where Defendant's fingerprints were found on a fentanyl press located in a gang-related residence.

With regard to substance abuse, Defendant reported no substance abuse treatment but stated, "They say I have an addiction." He acknowledged daily marijuana use, which was corroborated by Ms. George; however, she contradicted Defendant's denial of alcohol use, stating he consumes alcohol approximately three times a month. Defendant's drug screen tested presumptively positive for both alcohol and marijuana.

Although Defendant's criminal history consists mainly of vehicle operation related offenses, he has failed to appear in court in connection with nine of those offenses. In addition, the PTSR reveals that Defendant has other outstanding warrants, including for failure to pay child support, for contempt of court, and a civil warrant for neglect of a child. This pattern, spanning over a period of years, "demonstrates a risk of danger, a disregard for the law, and a risk of nonappearance." *United States v. Davis*, No. 3:25-CR-86, 2026 WL 243203, at *3 (E.D. Tenn. Jan. 29, 2026) (finding a defendant's history and characteristics weigh in favor of detention despite defendant arguing "that his criminal convictions are dated, failures to appear are mostly for civil traffic violations, and that he has now paid off his outstanding court costs") (citing 18 U.S.C. § 3142(g)(3)(A), (4)). On balance, Defendant's history and characteristics weigh in favor of detention.

As for "the nature and seriousness of the danger to any person or the community that would be posed by the person's release," 18 U.S.C. § 3142(g)(4), Defendant's alleged conduct involving the significant amounts of illegal drugs that are widely known to be fatal in even the smallest amounts and his actions in attempting to flee law enforcement during the November 2025 traffic stop combined with his failure to follow through with his cooperation agreement, returning to

31

Detroit, and "dropping" his phone, demonstrates the risk of further illegal activity and presents a particular danger to the community—that is, continued drug trafficking—if he were released. *See Hernandez*, 2002 WL 1377911, at *2 (holding that "the risk of continued drug-trafficking while released on bail constitutes a significant danger to the safety of the community").

Thus, the undersigned finds all four of the § 3142(g) factors support detention and observes that the USPO in this district recommends that Defendant not be released because of his dangerousness and risk of nonappearance. Considering all the § 3142(g) factors and the presumption, assuming it has been rebutted, the undersigned concludes that the information provided in the PTSR, the Memorandum, and the exhibits establish by clear and convincing evidence that the Defendant poses a danger to the community and by a preponderance of the evidence that Defendant presents a risk of nonappearance.

The undersigned further finds that no condition or combination of conditions will reasonably assure the safety of the community or Defendant's appearance in this case. The undersigned has considered the proposed conditions offered in connection with this de novo review, including that Defendant will live with his parents in Detroit, Michigan, that he will submit to GPS monitoring and a curfew, that he will submit to drug testing, maintain employment, and that he will not possess firearms. None of the proposed conditions are sufficient to allay the undersigned's concerns, and those concerns are too significant to be overcome by the support of family and friends and by GPS monitoring, which only assists in knowing Defendant's whereabouts, not what he is doing. Defendant's alleged conduct in inherently dangerous activity combined with his overall history and characteristics demonstrates the risk of nonappearance and danger that his release poses and leaves the undersigned with little confidence that Defendant would follow any conditions the Court would impose. "[A]lmost any conditional release ultimately depends on a court's assessment of a defendant's good faith intentions and predicted compliance

32

with conditions imposed." *United States v. Cornish*, 449 F. Supp. 3d 681, 684 (E.D. Ky. 2020) (citation omitted)).

## V.   CONCLUSION

Based upon a de novo review of all the evidence presented at the detention hearing in the Eastern District of Michigan and to the undersigned, and considering the factors set forth in 18 U.S.C. § 3142(g), the presumption, assuming it has been rebutted, and the recommendation of the USPO in this district, the undersigned finds by clear and convincing evidence that Defendant poses a danger to the community and by a preponderance of the evidence that he poses a risk of nonappearance. The undersigned also finds that there are no conditions that would mitigate that danger and reasonably assure the safety of the community or Defendant's appearance for court proceedings.

Accordingly, the undersigned **RECOMMENDS** that the District Judge grant Government's Emergency Motion [Doc. 47], revoke the release order, and order that Defendant remain detained pending further proceedings in this case.[17]

Respectfully submitted,

*Debra C. Poplin*

Debra C. Poplin
United States Magistrate Judge

---

[17]     Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to appeal the District Court's order. *Id.*; *see United States v. Branch*, 537 F.3d 582, 587 (6th Cir. 2008), *cert. denied*, 555 U.S. 1080 (2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). "[T]he district court need not provide *de novo* review where objections [to this report and recommendation] are [f]rivolous, conclusive, or general." *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986) (internal quotation omitted). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed. of Tchrs.*, 829 F.2d 1370, 1373 (6th Cir. 1987).

33